AVCO MANUFACTURING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 45633.    Filed January 31, 1956.

*John E. Hughes, Esq., John W. Hughes, Esq.,* and *Harold R. Burnstein, Esq.,* for the petitioner.
*William A. Schmitt, Esq.,* for the respondent.

VAN FOSSAN, *Judge:* Respondent determined deficiencies in income and excess profits taxes of petitioner for years and in amounts, as follows:

| Fiscal year ended November 30 | Income tax | Excess profits tax |
|---|---|---|
| 1944 | | $682, 786. 41 |
| 1945 | $122, 343. 70 | |
| 1946 | 1, 707, 031. 91 | |
| 1947 | 860, 800. 89 | |

At the trial of this proceeding, a stipulation of concessions by both parties was filed wherein 12 issues have been resolved. Such concessions will be given effect in the Rule 50 recomputation consequent hereon. The remaining issues in controversy are:

(1) Whether petitioner sustained a loss in the fiscal year ended November 30, 1946, on the liquidation of the Crosley Corporation;

(2) Whether the transfer of substantially all the assets of Lycoming Manufacturing Company to petitioner in exchange solely for voting stock of petitioner constituted a nontaxable reorganization under section 112 of the Internal Revenue Code of 1939;

(3) Whether respondent erred in reducing the loss petitioner sustained on the liquidation of American Propeller Corporation in the fiscal year ended November 30, 1947, and whether petitioner is entitled to a further loss in addition to that taken on its tax return;

(4) Whether petitioner is entitled to accelerated amortization on emergency plant facilities for the fiscal years ended November 30, 1944 and 1945;

(5) Whether the distribution by petitioner to its stockholders of American Airlines and Canadian Colonial Airways stocks during 1935 was out of earnings or profits as an ordinary dividend for invested capital purposes or constituted a partial liquidation;

(6) Whether a deduction for accrued compensation of petitioner's employees under its Extra Compensation Plan is properly allowable in the fiscal year ended November 30, 1947, rather than in that ended November 30, 1948;

(7) Whether petitioner is entitled to an expense deduction for excess tooling expense in the fiscal year ended November 30, 1947, rather than in that ended November 30, 1948.

### GENERAL FINDINGS OF FACT.

The stipulation of facts filed by the parties, with exhibits attached, is adopted and incorporated herein by this reference.

The petitioner, Avco Manufacturing Corporation, formerly named the Aviation Corporation, is a corporation organized and existing under the laws of the State of Delaware with its principal office at New York, New York. The tax returns for the years here involved were filed with the collector of internal revenue for the third district of New York. Petitioner kept its books and rendered its tax returns during such years on the accrual basis of accounting.

As of October 25, 1946, petitioner was directly engaged in the business of design, development, manufacture, and sale of aircraft engines, engine parts, and accessories, and, in addition, produced heating equipment for industrial and home use and operated a general foundry business and manufactured automatic garage door openers. It had its plants at Williamsport, Pennsylvania (Lycoming Division and Spencer Heater Division), Detroit, Michigan (Republic Aircraft Products Division), and Circleville, Ohio (Horton Manufacturing Division). Its wholly owned subsidiary, American Propeller Corporation (hereinafter sometimes referred to as Propeller) had its plant at Toledo, Ohio. At the above date, Propeller manufactured machine tools and dies instead of aircraft propellers.

In addition to other subsidiaries, petitioner owned 59.3 per cent of the voting stock of New York Shipbuilding Corporation and 26.1 per cent of the outstanding stock of Consolidated Vultee Aircraft Corporation. The latter corporation at its Nashville plant manufactured stoves, buses, bus parts, and frozen food storage cabinets.

### Issue 1.

### FINDINGS OF FACT.

The Crosley Corporation (hereinafter called Crosley) manufactured radio receiving sets and household refrigerators in Cincinnati, Ohio, and Richmond, Indiana, respectively. It also owned radio station WINS in New York and its wholly owned subsidiary, Crosley Broadcasting Corporation, and owns and operates radio station WLW in Cincinnati, Ohio.

Petitioner is a widely held corporation and its stock is listed on the New York Stock Exchange. During the years involved, its capitalization consisted of the following shares of stock issued and outstanding:

| At November 30 | Number of shares Common | Preferred |
|---|---|---|
| 1944 | 5, 793, 513 | ------- |
| 1945 | 5, 794, 346 | 300, 000 |
| 1946 | 6, 613, 424 | 267, 287 |
| 1947 | 6, 614, 674 | 257, 587 |

On March 4 and November 18, 1946, petitioner owned 496,030 shares, or 90.88 per cent of the 545,800 shares of the outstanding stock of Crosley. These 496,030 shares had previously been acquired by cash. On November 30, 1945, petitioner owned 483,409 of such shares, or 88.6 per cent, which it had previously purchased for $19,242,695.80 cash, and before March 4, 1946, it purchased an additional 12,621 shares of Crosley for $490,040.62 cash.

The petitioner, through its board of directors, at meetings held October 4 and 17, 1946, authorized the formation and execution of an "agreement and plan" for the transfer and acquisition of certain of its common stock for the net assets of Crosley and the liquidation of that corporation. The agreement and plan dated October 24, 1946, entered into between petitioner and Crosley, was adopted by the stockholders of Crosley at a special meeting held November 18, 1946. In accordance with the provisions of paragraph Second (a) of the agreement and plan dated October 24, 1946, petitioner waived its rights as a stockholder of Crosley to receive such shares of petitioner's stock, which, except for such waiver, would be distributable to petitioner in the liquidation of Crosley. Petitioner elected this course because its authorized stock was not sufficient to issue shares in exchange for all the outstanding stock of Crosley. Pursuant to the plan Crosley transferred all its assets to petitioner by bill of sale and the petitioner transferred 173,688 shares of its common stock to Crosley. Thereupon Crosley liquidated and distributed 173,688 shares of the common stock of petitioner to its stockholders other than petitioner in exchange for 43,422 shares of Crosley stock held by such stockholders. The holders of 6,545 shares dissented and received cash. Crosley ceased doing business as of November 18, 1946, pursuant to notice of liquidation.

On November 18, 1946, at 1: 22 p. m., after the adoption of the agreement and plan dated October 24, 1946, and before the transfer of the net assets of Crosley to petitioner, and before the liquidation of Crosley and distribution thereunder of the assets thereof as set forth in the agreement and plan, petitioner, pursuant to authorization of the executive committee of the board of directors, sold on the New York Stock

Exchange 200 shares of the common stock of Crosley to Smith Barney & Company, for cash, thus becoming and remaining during the interim period the owner of 495,830 shares of the 545,800 shares of Crosley stock outstanding; delivered properly endorsed stock certificates Nos. H4383 and H4384, each covering 100 shares of stock of Crosley; received the cash therefor, and deposited the receipts in its bank account. On its 1946 income tax return, petitioner deducted, and respondent has allowed, a loss of $2,081.74 on the sale of the 200 shares.

The cost of the 495,830 shares of Crosley was $19,725,487.85. The fair market value of petitioner's stock on November 18, 1946, was $6.50 per share. Petitioner received the Crosley assets for 173,688 of its own shares of common stock and in liquidation of the 495,830 shares of Crosley stock owned by it. The book value of the Crosley assets was $10,713,380.14 and the fair market value on date of their receipt by petitioner was $14,023,000. Respondent, in the notice of deficiency stated, as follows:

EXPLANATION OF ITEMS.

(i) Capital gain and losses (Sch. C) _____ $6,833,907.85

CROSLEY DIVISION:

The above loss on liquidation of the Crosley Corporation is being disallowed per Bureau Ruling dated Oct. 15, 1951—IT:R:B:SEC. This ruling held that the liquidation fell within the provisions of Section 112 (B) (6) [*sic*] of the Internal Revenue Code and that no gain or loss to any of the corporations will result.

OPINION.

The first question is whether petitioner on the above facts sustained a recognizable loss in the fiscal year ended November 30, 1946, on the liquidation of Crosley.

As at November 18, 1946, petitioner owned 496,030 shares or 90.88 per cent of the 545,800 shares of outstanding stock of Crosley. On such date, the Crosley stockholders adopted an agreement and plan dated October 24, 1946, providing for the transfer and acquisition of certain of petitioner's common stock for the net assets of Crosley and the liquidation of that corporation. Thereafter, on the same day, but prior to the liquidation of Crosley and the distribution of its assets, petitioner sold for cash on the New York Stock Exchange 200 shares of Crosley common stock to Smith Barney & Company, thus becoming and remaining during the interim period the owner of 495,830 shares of the total of Crosley stock outstanding. In its 1946 return, petitioner claimed and respondent allowed a deduction for the loss sustained by petitioner on such sale. Petitioner's claimed deduction for the loss incurred by it in the liquidation was disallowed by respondent on the

grounds that the transaction was one falling within the nonrecognition provisions of section 112 (b) (6) of the 1939 Code.[1]

In defense of his determination, respondent takes the position that the sale of the 200 shares of Crosley stock served no business purpose; that the sole object therefor was to circumvent the statute and avoid taxation; and that the prearranged sale of an insignificant amount of petitioner's holdings of Crosley stock was without substance and should be disregarded. It is not the *fact* of the sale, respondent argues, but the *planning* of it that makes the transaction a sham. Finally, respondent poses the question of whether the courts will approve such a sellout device having no other object than the defeat of the statutory ends.

Admittedly, the sale in question was prearranged and timed for the period between the adoption of the plan of liquidation and the final distribution of Crosley assets thereunder for the express purpose of avoiding the nonrecognition provisions of the statute. For this reason, such conduct must be subjected to close scrutiny. Nevertheless, if, upon such scrutiny, the sale appears to have been a bona fide transaction in that it was in substance what it purported to be in form, then the tax motive therefor will be disregarded. *Gregory* v. *Helvering*, 293 U. S. 465. The cases are legion that if a transaction is in fact real and bona fide and if the only criticism is that someone gets a tax advantage, such transaction may not be characterized as a sham. Thus, in *Commissioner* v. *Day & Zimmerman, Inc.*, 151 F. 2d 517, upon which case petitioner strongly relies, a bona fide sale by the taxpayer to its treasurer of a sufficient amount of the stock of two subsidiaries to assure noncompliance with the stock ownership requirement of section 112 (b) (6) was held to render the provisions of such statute inapplicable on the subsequent liquidation of the subsidiaries. Literally thousands of sales are made every year for no other purpose than to register a tax loss, but if they are real, they are not to be ignored.

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(6) PROPERTY RECEIVED BY CORPORATION ON COMPLETE LIQUIDATION OF ANOTHER.—No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if—

(A) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 per centum of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), and was at no time on or after the date of the adoption of the plan of liquidation and until the receipt of the property the owner of a greater percentage of any class of stock than the percentage of such class owned at the time of the receipt of the property; and

As to the bona fides of the sale in the instant case, we entertain no doubts. Such transaction may have had no direct connection with the business conducted by either petitioner or Crosley, yet it was not a sham. Petitioner actually parted with ownership and control of the shares in dispute and thereafter exercised no domination thereover. This sale may not be disregarded. *W. P. Hobby*, 2 T. C. 980, at 985. Respondent has recognized the reality of the "sale" by allowing a deduction for the loss sustained. Nor does the planning and timing of the sale make it any less real. That petitioner chose to sell but 200 shares instead of 2,000 or 20,000 shares is of no significance. The statute plainly proscribes the disposition of any shares during the period of liquidation. Respondent would apparently have us hold that what is really meant by such proscription is the disposition of a reasonable or significant amount of stock, thereby placing on the Court the task of determining if the amount sold was a reasonable or significant amount. So to hold would be to usurp the legislative function. In our judgment, the statute is clear and unambiguous. Section 112 (b) (6) first appeared in the Revenue Act of 1935. That specific provision never became operative by reason of the passage of the Revenue Act of 1936, which superseded and amended the 1935 Act. There is nothing in the congressional history of the Act which suggests an interpretation such as respondent urges. Nor does exhaustive research of the cases reveal any authority to support respondent. The case of *Commissioner* v. *Day & Zimmerman, Inc.*, *supra*, is squarely in point. In fact, the petitioner is supported by the Commissioner's own regulations (Regs. 111, sec. 29.112 (b) (6)).

Respondent suggests finally that neither the loss nor the amount thereof has been proved. The short answer is that the evidence of record, which evidence we have no reason to discount, clearly establishes such loss in the amount of $6,833,907.85, as contended by petitioner. Moreover, respondent has inferentially conceded such in his determination.

We sustain the petitioner on this issue and hold that petitioner's loss on the distribution in complete liquidation of Crosley should be recognized.

### *Issue 2.*

#### FINDINGS OF FACT.

On October 16, 1939, petitioner, under its former name, the Aviation Corporation, entered into an agreement with Lycoming Manufacturing Corporation (hereinafter called Lycoming or Company), which agreement provided for the transfer and conveyance of the latter's

assets to the former. At that time, Lycoming was party to a proceeding under 77B of the Bankruptcy Act in the United States District Court for the Northern District of Indiana. On or about October 19, 1939, a proposed plan for reorganization of Lycoming was filed with the District Court, which plan provided, in part, as follows:

The Aviation Manufacturing Corporation, a wholly owned subsidiary of Aviation Corporation, is at present a lessee of part of the Company's plant at Williamsport.

Because of the increased activity in the aviation field, Aviation Corporation is desirous of extending its business and consolidating various phases of its activities in one location.

To avoid the delays incident to the construction of new plants and to facilitate compliance with the suggestions of the War Department in respect of timely deliveries, Aviation Corporation entered into negotiations with the Company looking toward the acquisition of the Company's assets and business.

On October 16, 1939 the Company entered into a contract with Aviation Corporation, pursuant to the terms of which Aviation Corporation agreed:

(a) To issue and deliver to the Company, 206,000 shares of its common capital $3.00 par value stock fully paid and non-assessable;

(b) To assume, pay and discharge all expenses of the Company incurred since the institution of the proceedings for reorganization under Section 77B of the Bankruptcy Act, except expenses for counsel fees, reorganization, excess profit and income taxes and liabilities not disclosed in the contract;

(c) To use its best efforts to cause said shares to be listed upon the New York Stock Exchange; and

(d) To use its best efforts to cause registration to be effectuated for such shares if the same should become necessary.

The Company agreed, in exchange for the foregoing, to transfer free and clear of liabilities, all of its assets, good will and business, except $5,000 in cash.

On November 13, 1939, pursuant to an order of such court, Lycoming transferred all of its assets (except a small amount of cash) to petitioner for 206,000 shares of petitioner's voting stock having a par value of $3 and a fair market value of $8.125 per share and the assumption of liabilities incurred by Lycoming after it went into the 77B proceedings. On November 16, 1939, petitioner's directors voted to transfer the assets of Lycoming thus acquired to Aviation Manufacturing Corporation (hereinafter called Aviation) as of November 13, 1939, as a capital contribution and nothing was received by petitioner therefor. Aviation was the wholly owned subsidiary of petitioner. As at the time of the foregoing agreement between petitioner and Lycoming and the execution thereof, Aviation was the lessee of part of Lycoming's plant facilities wherein its operations were for the most part conducted. Aviation had purchased some machinery and equipment from Lycoming in a prior year. It had no other connection with Lycoming at any time.

At petitioner's request, respondent, on January 23, 1942, issued a letter ruling which provided, in part, as follows:

The transfer of substantially all of the assets of Lycoming Manufacturing Company to The Aviation Corporation, in exchange solely for voting stock of the latter, constituted a reorganization, within the meaning of Section 112 (g) (1) (C) of the Internal Revenue Code, as amended.

In 1951 the above ruling was reversed and the transaction involved held to be taxable.

OPINION.

This issue involves petitioner's acquisition of the assets of Lycoming and its subsequent transfer thereof to Aviation. Specifically, the question is whether such acquisition was a resultant of a nontaxable reorganization so as to give effect to the value thereof on the books of Lycoming rather than their cost to petitioner for purposes of invested capital and depreciation allowances.*

The salient facts are these. In 1939 when Lycoming was a party to a proceeding under 77B of the Bankruptcy Act, petitioner entered into an agreement with Lycoming to acquire the assets thereof—part of which were then leased to petitioner's subsidiary, Aviation—in exchange solely for petitioner's stock and the assumption by petitioner of certain expenses incurred by Lycoming since the institution of the 77B proceeding. This agreement was subsequently approved by the District Court as part of the proposed plan of reorganization of Lycoming, and the exchange effected. On the third day following such exchange, petitioner's board of directors transferred all the assets which had been received by petitioner to Aviation as of the date of the original exchange and as a contribution to capital. When requested, respondent in 1942 ruled that the foregoing transaction was one in which no gain or loss would be recognized. Some 9 years later, respondent reversed such ruling. As a result thereof, respondent disallowed deductions for depreciation taken by petitioner for the years 1944 through 1947 and reduced petitioner's invested capital for the years 1944 through 1946 thereby giving rise to the present question.

Respondent argues that the plan, pursuant to which the exchange was effected, envisaged the immediate transfer of the Lycoming assets thus acquired by petitioner to its subsidiary, Aviation; that, this being true, the transferors would not have maintained the requisite continuity of interest; and that, therefore, the exchange did not qualify as one in which no gain or loss would be recognized under the provisions

---

*NOTE: The parties have stipulated the amount of the additional deductions for depreciation and the increase in invested capital if the transaction is held to be a nontaxable reorganization.

of either section 112 (g) (1) (C) or section 112 (b) (10) (B) of the Internal Revenue Code of 1939.[2]  Respondent's position is based upon the rationale of *Groman* v. *Commissioner*, 302 U. S. 82; *Helvering* v. *Bashford*, 302 U. S. 454; *Anheuser-Busch, Inc.*, 40 B. T. A. 1100, affd. 115 F. 2d 662, certiorari denied 312 U. S. 699; and Regulations 111, section 29.112 (b) (10)–1, the provisions of which were approved by this Court in *Chicago Stadium Corporation*, 13 T. C. 889.

Petitioner denies the applicability of the *Groman, Bashford* and *Anheuser-Busch* cases in the instant transaction.  It contends that the subsequent transfer by it of the Lycoming assets to Aviation is immaterial and is to be disregarded inasmuch as such transfer was not an interdependent step in the transaction between it and Lycoming, see *American Bantam Car Co.*, 11 T. C. 397; *American Wire Fabrics Corporation*, 16 T. C. 607, 613, nor was it an integral part of the plan under which the transaction was effected.  See *Wilgard Realty Co.*, 43 B. T. A. 557, 560–561, affd. 127 F. 2d 514, certiorari denied 317 U. S. 655; *National Bellas-Hess, Inc.*, 20 T. C. 636.  With respect to section 112 (b) (10), *supra*, petitioner maintains that this case should be governed by *Standard Coal, Inc.*, 20 T. C. 208, and that, in any event, it makes no difference under such statute whether the plan did or did not provide for the transfer to a subsidiary.  We disagree.

Petitioner's whole case on this issue hinges upon the determination whether the subsequent transfer is to be considered as part of the plan pursuant to which the exchange in controversy was effected.  It is clear from the evidence that petitioner's sole objective in entering into the transaction with Lycoming was to acquire the property thereof for use in connection with the business carried on by Aviation, which subsidiary was already the lessee of part of the property involved.  Further, it is also evident that Lycoming, as well as the

---

[2] SEC. 112.  RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

(10) GAIN OR LOSS NOT RECOGNIZED ON REORGANIZATION OF CORPORATIONS IN CERTAIN RECEIVERSHIP AND BANKRUPTCY PROCEEDINGS.—No gain or loss shall be recognized if property of a corporation (other than a railroad corporation, as defined in section 77m of the National Bankruptcy Act, as amended) is transferred, in a taxable year of such corporation beginning after December 31, 1933, in pursuance of an order of the court having jurisdiction of such corporation—

\* \* \* \* \* \* \*

(B) in a proceeding under section 77B or Chapter X of the National Bankruptcy Act, as amended,

to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in exchange solely for stock or securities in such other corporation.

\* \* \* \* \* \* \*

(g) DEFINITION OF REORGANIZATION.—As used in this section (other than subsection (b) (10) and subsection (1)) and in section 113 (other than subsection (a) (22))—

(1) The term "reorganization" means \* \* \* (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, \* \* \*

District Court, pursuant to the order of which the exchange was carried out, were both aware of this purpose. To achieve such end, petitioner, following the exchange, had three alternatives. It could retain possession of the property and lease it to Aviation; it could liquidate Aviation and become the operating company itself; or it could transfer the property outright to Aviation. Although it was not until the meeting of its board of directors on the third day following the exchange that petitioner chose the last alternative, it, nevertheless, cannot be denied that the subsequent transfer of the property to Aviation was a contemplated possibility under the plan that actually eventuated. The transfer, therefore, is to be treated as a part of the plan, *Anheuser-Busch, Inc., supra,* and an interdependent step therein. *American Bantam Car Co., supra; American Wire Fabrics Corporation, supra.* Nor is it of consequence that the transfer was not specifically provided for in the written agreement embodying such plan. *Standard Coal, Inc., supra; C. T. Investment Co.* v. *Commissioner,* 88 F. 2d 582; *William H. Redfield,* 34 B. T. A. 967; *Hortense A. Meneffee,* 46 B. T. A. 865; see also *Charles A. Dana,* 36 B. T. A. 97.

Petitioner argues further that Aviation was its wholly owned subsidiary and that it is absurd to say that it had only a transitory ownership in the assets thereof or that its interest and that of its stockholders does not continue therein. A somewhat similar argument has heretofore been advanced and rejected by the courts. See *Richard K. Mellon,* 12 T. C. 90; *Groman* v. *Commissioner, supra.* As in the *Mellon* case, there is even less continuity of interest here than there was in the *Groman* case. The shareholders of Lycoming received no stock interest in Aviation. They lost all their interest as corporate shareholders in the assets transferred to Aviation and acquired an interest in different assets, namely, those of petitioner, a portion of which consisted of common stock of Aviation. *Richard K. Mellon, supra.*

*Standard Coal, Inc., supra,* on which petitioner relies to support its contention that the transfer in question qualified as nontaxable under the provisions of section 112 (b) (10), *supra,* is distinguishable. There, in accordance with a plan of reorganization approved by the bankruptcy court, property of an insolvent predecessor was acquired at a foreclosure sale by the corporate taxpayer, the stockholders of which were the majority of the predecessor's bondholders. We held there that the assets were transferred "to effectuate a plan of reorganization approved by the court" within the meaning of section 112 (b) (10), *supra.* In so holding, we found that since the bondholders' control had been effectively established by the institution of foreclosure proceedings, the necessary continuity of interest was present. As we have pointed out above, such is lacking here. While the term "re-

organization" as used in section 112 (b) (10), *supra*, is not controlled by definition thereof contained in section 112 (g), nevertheless, such section contemplates a continuity of interest as a prerequisite to its application. *Chicago Stadium Corporation, supra; Davis* v. *Bankhead Hotel, Inc.*, 212 F. 2d 697; see also S. Rept. No. 627, 78th Cong., 1st Sess., p. 49–53; Regs. 111, sec. 29.112 (b) (10)–1.

As for respondent's earlier view expressed in the aforementioned letter ruling, we are aware of no authority to the effect that respondent is estopped to reverse such ruling if in the light of further evidence it is deemed to be violative of the law. See *James Couzens*, 11 B. T. A. 1040; cf. *Richard K. Mellon, supra*.

We, accordingly, hold that the transaction in controversy did not qualify as one in which no gain or loss was recognizable under either section 112 (g) (1) (C) or section 112 (b) (10).

## *Issue 3.*

### FINDINGS OF FACT.

Petitioner purchased the tangible assets of Propeller, its wholly owned subsidiary, on November 30, 1946, for $521,119.05, the book value thereof. The assets thus acquired included the following:

*Emergency Facilities Fully Amortized Turned Over to Avco November 30 by American Propeller*

| | |
|---|---:|
| Land | $7,087.83 |
| Building | 193,556.35 |
| Building electric outside | 6,177.10 |
| Building heating and plumbing | 35,440.00 |
| Building switchboard | 59,190.60 |
| Machinery and equipment | 27,697.03 |
| Office furniture and fixtures | 13.89 |
| Res amortization | $329,162.80 |

As of November 30, 1946, the book value of the foregoing amortized assets was zero.

On October 31, 1947, Propeller was liquidated. At this time, Propeller was indebted to petitioner in the sum of $200,000, representing cash advanced thereto by petitioner. Petitioner had an investment of $404,750 in Propeller, which investment represented petitioner's paid-in capital stock investment in Propeller. On liquidation, petitioner received, per books, assets valued at $126,615.08, consisting of $113,805.81 in cash and $12,809.27 in renegotiation rebate receivables, and assumed liabilities aggregating $127,298.53. Subsequently the United States Government determined that it had overpaid Propeller in 1944 and 1945 in the aggregate amount of $224,753.07, to which determination petitioner agreed and refunded such amount to the

Government. The plant assets which it had purchased from Propeller in 1946, were sold as a package in 1948 for $610,000.

On its income tax return for the fiscal year ended November 30, 1947, petitioner claimed a bad debt loss deduction of $200,683.45, and a deduction for loss of its investment in Propeller in the amount of $404,750. In the notice of deficiency, respondent stated as follows:

American Propeller Corporation, a wholly-owned subsidiary, sustained net operating losses in FYE 11/30/40 and FYE 11/30/41 totaling $187,598.73. This loss was deducted by taxpayer in computing the Consolidated Excess Profit [*sic*] Tax for FYE 11/30/42. The fair market value of assets taken over by taxpayer from the liquidated corporation was $526,280.00 instead of the reported value of $401,826.79. Thus the loss shown on the return as Bad Debts (Sch. G) and Loss on Investment (Schedule K) are reduced by $312,051.94; that is, ($187,598.73 plus $124,453.21).

## OPINION.

The question arising from these facts involves the propriety of respondent's reduction of petitioner's loss incurred in connection with the liquidation of Propeller.

Propeller, the wholly owned subsidiary of petitioner, was liquidated on October 31, 1947. At that time, Propeller was indebted to petitioner in the amount of $200,000. In addition, petitioner's paid-in capital stock investment in Propeller was $404,750. In the liquidation, petitioner received assets valued at $126,615.08 and assumed liabilities aggregating $127,298.53. On its income tax return for the fiscal year 1947, petitioner claimed a deduction for a bad debt loss on the indebtedness of Propeller in the amount of $200,683.45, and the loss of the amount of its investment therein.

Respondent has reduced the aggregate amount of bad debt and investment losses by $312,051.94, $187,598.73 of which was disallowed on grounds that it represented net operating losses sustained by Propeller in the fiscal years ended November 30, 1940 and 1941, and deducted by petitioner "* * * in computing the Consolidated Excess Profit [*sic*] Tax for FYE 11/30/42. * * *" As to the remaining $124,453.21, respondent's basis for such reduction was that the fair market value of the assets distributed to petitioner in the liquidation of Propeller was understated by this amount. It is now stipulated that such amount represents the profit realized by petitioner on the sale of the plant it bought from Propeller in 1946.

With respect to the foregoing $187,598.73, petitioner, faced with the burden of proving the negative fact that this amount was not taken as a deduction in the prior year, has called upon respondent to produce in evidence its tax returns for such year. The evidence thus introduced does not include a consolidated excess profits tax return. Apparently admitting that none was filed, respondent points out that his determi-

nation was that the loss was deducted in computing the consolidated excess profits tax for such year without respect to whether a consolidated or individual return was filed, and that the mere introduction of petitioner's 1942 tax return is insufficient to overcome the presumption of correctness accorded to such determination. Be that as it may, we think that such evidence is sufficient to place upon respondent the burden of going forward with further evidence bearing upon the point, if any there be, which evidence would necessarily be in respondent's possession. He has failed to sustain such burden and is, therefore, reversed as to this item.

Respondent's action with regard to the $124,453.21 profit realized by petitioner on the sale of the plant in 1948 is predicated upon the theory that, at the time of its acquisition, it had a book value of zero, but was actually very valuable. In this connection, respondent maintains that it has not been shown that the 1948 sales price was not the same as the value thereof when bought in 1946. Thus, it is respondent's position that this value should be reflected in reduction of petitioner's loss in 1947, by reason of its investment in Propeller. We do not agree.

The property involved was not received by petitioner as a distribution in liquidation of Propeller in 1947. Rather, it was acquired by outright purchase in 1946. Such property was sold by petitioner in 1948 at a profit in the amount of the sum here in controversy. If it be said that the 1948 sales price was the same as the value of the property when bought in 1946, and, further, that the difference between such value and the price actually paid by petitioner was in the nature of a distribution of earnings and profits taxable as a dividend, then the amount of the difference was includible in petitioner's 1946 gross income. See also Regs. 111, sec. 29.22 (a)–1.[3] Otherwise such amount is taxable as a gain in 1948, the year of the closed transaction in which the property was sold. *Helvering* v. *Nibley-Mimnaugh Lumber Co.*, 70 F. 2d 843; cf. also Regs. 111, sec. 29.23 (e)–1; see also I. T. 3323 and I. T. 3485. In no event would such gain be recognized and included in income in 1947. Respondent cites no authority for the proposition advanced by him and we have found none. His determination in this regard is set aside.

Respondent points to the apparent contradiction in the use of the terms "fair market value" and "per books" in the provision of the

[3] Regs. 111, SEC. 29.22 (a)–1. WHAT INCLUDED IN GROSS INCOME.— * * *
  *   *   *   *   *   *   *
If property is transferred by a corporation to a shareholder, for an amount less than its fair market value, regardless of whether the transfer is in the form of a sale or exchange, such shareholder shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of a distribution of earnings or profits taxable as a dividend. In computing the gain or loss from the subsequent sale of such property its basis shall be the amount paid for the property, increased by the amount of such difference included in gross income. * * *

stipulation filed here to the effect that on "* * * liquidation * * * [of Propeller] * * * petitioner received per books assets with a fair market value of $126,615.08 consisting of $113,805.81 in cash and $12,809.27 in renegotiation rebate receivable." However, as noted by petitioner, the fair market value of the cash and the account receivable would, under no circumstances be greater than the face or book value thereof.

By amendment to its petition, petitioner assigns as error respondent's failure to allow an additional bad debt loss of $58,600.74 on the liquidation of Propeller in 1947. The facts of record upon which petitioner relies to establish such claim are that subsequent to such liquidation the Government determined Propeller had been overpaid in 1944 and 1945 in the amount of $224,753.07. It is petitioner's contention that this amount, less the refund which it alleges is due Propeller for 1944 and 1945 of $164,802.34 tax paid on these profits, represents an additional loss. Petitioner has thus claimed an additional loss on the liquidation of Propeller in the amount of $58,600.74, which claim has been reduced on brief to $53,491.23.

Contenting himself with a general denial in the pleadings and an objection, on brief, that the record contains no evidence of the amount of the refund, if any, received by petitioner, respondent takes no position nor makes any argument with regard to this additional claim. It is quite true there is no direct evidence before us indicating that petitioner has ever filed a claim for such refund, the amount thereof, or whether it has or will be allowed in full. Nevertheless, the fact remains that petitioner incurred an additional expense in repaying the $224,753.07 to the Government. Moreover, this expense was properly accruable as a 1944 and 1945 liability of Propeller even though the precise amount thereof was unknown in those years. *ACF-Brill Motors Co.*, 14 T. C. 263; *Uncasville Mfg. Co.* v. *Commissioner*, 55 F. 2d 893, certiorari denied 286 U. S. 545. Thus, such additional liability should be reflected in computing petitioner's loss on the liquidation of Propeller.

We have therefore applied the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540, and determined that petitioner is entitled to an additional loss deduction in 1947 in the amount of $40,000.

## *Issue 4.*

### FINDINGS OF FACT.

Aviation (Lycoming Division) entered into an "Emergency Plant Facilities Contract" with the War Department under date of December 6, 1940, to make engines and spare parts. In connection therewith, Aviation undertook to acquire or construct certain emergency plant

facilities to be used in the performance of such contract. The War Department agreed to reimburse Aviation for the cost of these facilities in 60 monthly installments beginning the month following completion thereof. Under the contract, title to the facilities remained in Aviation until it was fully reimbursed therefor. Aviation, with its own funds, acquired or constructed these facilities at a cost of $1,824,-711.33, plus $18,500 interest.

The aforementioned contract between the War Department and Aviation provided, in part, as follows:

### ARTICLE XIX—TAX AMORTIZATION

Inasmuch as it is the intent of sections 23 and 124 of the Internal Revenue Code, unless payments made on account of Government Reimbursements for Plant Costs are included in gross income, not to allow (1) the tax deduction for amortization over a 60-month period of the Emergency Plant Facilities, or (2) the inclusion of such payments in invested capital for purposes of the excess-profits tax, the Contractor agrees that, if such payments to the extent they constitute reimbursements for capital expenditures made in acquisition or construction of such Emergency Plant Facilities, are not includible in gross income, then, for Federal tax purposes, (1) the basis of such Emergency Plant Facilities shall be computed without taking into account capital expenditures for which the Contractor has been or will be so reimbursed and (2) the amount of such reimbursements shall not be treated as paid-in surplus or contributions to capital for purposes of the excess-profits tax. In the event that the Contractor makes application to the Advisory Commission to the Council of National Defense and to the Department of War for a certificate with respect to terms contained in this contract or the necessity for any item or group of items of the Emergency Plant Facilities under Section [sic] 23 and 124 of the Internal Revenue Code in accordance with rules governing such applications and the Contractor is thereafter refused the issuance of such certificates by either such Commission or the Department of War, this contract shall terminate forthwith with the same effect as though a termination notice had been filed pursuant to Section 1 of Article III hereof.

Certificates of necessity were issued, pursuant to section 124 of the Internal Revenue Code, on January 24, 1941, April 6, 1943, and May 20, 1943, covering the facilities acquired, to be acquired, and constructed pursuant to the foregoing contract. On December 8, 1941, Aviation was merged with and into petitioner. As reimbursement of the cost of the facilities under the above contract, the following amounts were paid each year by the Government.

| | |
|---|---|
| 1944—$321, 279. 48 | 1945—$321, 279. 46 |
| 60, 020, 05 | 60, 020. 05 |

Payments received in subsequent years were included in income when received. Petitioner received full reimbursement over a period of 60 months from the Government for the cost it incurred in the acquisition and construction of emergency plant facilities. Petitioner made a proper election in its tax returns to take amortization on the facilities

covered in the above-mentioned necessity certificates over a 60-month period commencing on the first day of the month following the completion of the acquisition.

The President, on September 30, 1945, proclaimed the ending of the emergency period as defined in section 124, *supra*. On December 21, 1945, petitioner properly filed an election to terminate the amortization on September 30, 1945, in accord with the President's Proclamation and section 124.

Respondent held that petitioner received full reimbursement and had no cost of its own or for the facilities which had been constructed at Government expense; accordingly, respondent changed the rate of accelerated amortization from 34 months, as claimed by petitioner, to 60 months. The Commissioner disallowed the excess and contends that any further allowance will afford a tax advantage not contemplated by the revenue laws. Petitioner claims that it was entitled to additional amortization on the facilities in the amount of $110,153.59 in 1944 and $28,244.72 in 1945.

OPINION.

The question here involved is the propriety of petitioner's claim for accelerated amortization on emergency plant facilities for the fiscal years ended November 30, 1944 and 1945. The statutes involved are section 23 (t) and section 124 of the Internal Revenue Code of 1939, the pertinent portions of which appear in the margin.[4]

---

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(t) AMORTIZATION DEDUCTION.—The deduction for amortization provided in section 124.

SEC. 124. AMORTIZATION DEDUCTION.

(a) GENERAL RULE.—Every person, at his election, shall be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of any emergency facility (as defined in subsection (e)), based on a period of sixty months. Such amortization deduction shall be an amount, with respect to each month of such period within the taxable year, equal to the adjusted basis of the facility at the end of such month divided by the number of months (including the month for which the deduction is computed) remaining in the period. Such adjusted basis at the end of the month shall be computed without regard to the amortization deduction for such month. The amortization deduction above provided with respect to any month shall, except to the extent provided in subsection (g) of this section, be in lieu of the deduction with respect to such facility for such month provided in section 23 (1), relating to exhaustion, wear and tear, and obsolescence. The sixty-month period shall begin as to any emergency facility, at the election of the taxpayer, with the month following the month in which the facility was completed or acquired, or with the succeeding taxable year.

\* \* \* \* \* \* \*

(d) TERMINATION OF AMORTIZATION PERIOD.—

(1) If the President has proclaimed the end of the emergency period (as defined in subsection (e)·), or if the Secretary of War or the Secretary of the Navy has, in accordance with regulations prescribed by the President, certified to the Commissioner that an emergency facility ceased, on the date specified in the certificate, to be necessary in the interest of national defense during the emergency period, and if the date of such proclamation or the date specified in such certificate occurs within sixty months from the beginning of the amortization period with respect to such emergency facility,

Under date of December 6, 1940, Aviation and the War Department entered into an "Emergency Plant Facilities Contract" pursuant to which the former agreed to manufacture engines and spare parts and to acquire or construct certain plant facilities for use in connection therewith. The War Department agreed to and did reimburse Aviation and its successor, petitioner, for the cost of such facilities in 60 monthly installments beginning the month following completion thereof. Such payments were included in income when received. Aviation was merged into petitioner on December 8, 1941. Title to the facilities remained in Aviation, or petitioner, until the Government made its last payment. Prerequisite certificates of necessity were duly issued covering the facilities involved. Petitioner properly elected in its tax returns to amortize the cost thereof over the 60-month period beginning the first day of the month following the completion thereof. By Presidential proclamation the emergency period was ended on September 30, 1945, and petitioner thereafter properly filed its election to terminate the amortization on such date in accordance with section 124 (d).

then the taxpayer may elect (in accordance with paragraph (4) of this subsection) to terminate the amortization period with respect to such emergency facility as of the end of the month in which such proclamation was issued or in which occurred the date specified in such certificate, whichever is the earlier. In such case the amortization period with respect to such facility shall end with the end of such month in lieu of the end of the sixty-month period.

\*     \*     \*     \*     \*     \*     \*

(4) The election provided in paragraph (1), (2), or (3) shall be made by filing with the Commissioner, in such manner, in such form, and within such time, as the Commissioner with the approval of the Secretary may by regulations prescribe, a statement of such election. When such election has been so made, then, under regulations prescribed by the Commissioner with the approval of the Secretary, the taxes for all taxable years, beginning with the taxable year in which the amortization period began, shall be computed in accordance with an amortization deduction computed in accordance with the method provided in subsection (a), but using (in lieu of the sixty-month period provided in such subsection) the amortization period specified in paragraph (1), (2), or (3), as the case may be.

\*     \*     \*     \*     \*     \*     \*

(h) PAYMENT BY UNITED STATES OF UNAMORTIZED COST OF FACILITY.—If an amount is properly includible in the gross income of the taxpayer on account of a payment with respect to an emergency facility and such payment is certified as provided in this paragraph, then, at the election of the taxpayer in its return for the taxable year in which such amount is so includible—

(1) The amortization deduction for the month in which such amount is so includible shall (in lieu of the amount of the deduction for such month computed under subsection (a)) be the amount so includible, but such deduction shall not be in excess of the adjusted basis of the emergency facility as of the end of such month (computed without regard to any amortization deduction for such month). Payments referred to in this paragraph shall be payments the amounts of which are certified, under such regulations as the President may prescribe, by either the Secretary of War or the Secretary of the Navy as compensation to the taxpayer for the unamortized cost of the emergency facility made because—

(A) A contract with the United States involving the use of the facility has been terminated by its terms or by cancellation, or

(B) the taxpayer had reasonable grounds (either from provisions of a contract with the United States involving the use of the facility, or from written or oral representations made under authority of the United States) for anticipating future contracts involving the use of the facility, which future contracts have not been made.

It is petitioner's contention that, having thus elected to take accelerated amortization on the plant facilities involved, the plain words of the statute entitle it to take the increased deductions therefor as claimed. Petitioner, therefore, seeks to justify its amortization of such facilities over a period of 34 months albeit payments in reimbursement for the cost thereof, which payments were required to be returned as ordinary income, were received over 60 months. Petitioner, of course, recognizes that, under such circumstances, the amortization deductions thus taken by it were in the aggregate greater than its income from reimbursement in the corresponding period; nevertheless, petitioner insists that section 124 (d) gave it the privilege of recomputing its amortization deduction on the basis of the shorter period and that there is nothing therein which envisages the forfeiture of that privilege by reason of its receipt of reimbursements over a longer period which it included in income when received.

Respondent's position, on the other hand, is that petitioner received full reimbursement and had no cost of its own for the facility in dispute; that as such reimbursement was received and included in income by petitioner, a corresponding deduction was properly allowed to offset the amount thereof; and that any further allowance would not reflect the true income from these transactions and would afford a tax advantage not contemplated by the tax statutes. Thus, respondent would limit petitioner's amortization deduction to the amount of income received as reimbursement and require that such amortization be taken over 60 months.

Petitioner rests its case primarily upon its interpretation of the opinion rendered by this Court in *Cramp Shipbuilding Co.*, 14 T. C. 33, affirmed sub nom. *Commissioner* v. *Harriman Ripley & Co.*, 202 F. 2d 280; respondent relies on the opinion of the United States District Court for the Eastern District of Pennsylvania in the case of *United States* v. *Milnor Corp.*, 85 F. Supp. 931. Both parties profess to recognize an apparent conflict between the cases they respectively rely upon. Such conflict, however, is not so readily apparent to us.

True, both cases involved amortization of emergency facilities acquired or constructed pursuant to contracts which, for aught that appears, were quite similar in their terms. Moreover, the provisions of both such contracts appear to have been substantially identical with those of the contract with which we are here concerned. However, in the *Cramp* case, the taxpayer entered into a closing agreement with respondent wherein it was agreed that the facilities there involved would be subject to an allowance for amortization deductions as provided by section 124. The case came before this Court for an interpretation of and a decision on the effect of such agreement. In addition, the parties had stipulated facts satisfying the requirements of section

124 and showing the amount of deductions to which the taxpayer was entitled. We held that respondent was bound by his closing agreement regardless of the legal merits thereof and that, under the circumstances, the taxpayer was entitled to the accelerated amortization sought. In so holding we did not consider the merits of, nor pass upon the question, whether, absent the closing agreement, the taxpayer would be entitled to the deductions. Petitioner's interpretation thereof is not persuasive and its reliance thereon is misplaced.

In *United States* v. *Milnor Corp.*, *supra*, on facts which are strikingly parallel to those in the instant case, District Judge Wyche, in a well reasoned opinion based on a thorough consideration of the question involved and a detailed analysis of the legislative history of the statute in point, held that the taxpayer was entitled to amortize deductions for corporate income and excess profits tax purposes only to the extent that payments in reimbursement were included in income and as an offset thereto. In arriving at his conclusions, the court spoke, in part, as follows:

> A reading of the contract makes it apparent that the taxpayer corporation incurred no expense or loss due to any estimated consumption of the facilities or their decrease in value. Even if we regard the taxpayer as having itself, rather than the bank, laid out the money, it did so only after the Government had guaranteed to reimburse it for every dollar expended. Whether the plant became utterly worthless in one year or five years could make no difference to the taxpayer because it could lose nothing, since the Government was required to repay it in any event. While the taxpayer had title to the plant it was obviously merely a security title, intended to facilitate its borrowing the necessary construction funds initially from the bank. At the end of the term of the contract, title was to revert to the Government, and the taxpayer could obtain the plan only by paying the Government a reasonable purchase price. * * *
>
> *       *       *       *       *       *       *
>
> To say the taxpayer should be entitled to write off the costs of the plant against its gross income because it initially laid out the funds to build it is not consistent with the fundamental purpose of any deduction for depreciation or amortization. Under the circumstances here involved, the fact that the taxpayer had laid out the funds initially still would not make the consumption, wearing out or decrease in value *its* expense rather than that of the Government. * * *

The foregoing is apposite here.

It is clear from the legislative history of the statute in controversy that Congress intended such as a relief provision permitting taxpayers who invested their private capital in emergency facilities "to amortize the cost thereof over a shorter period than would be permitted under the depreciation provisions of the Internal Revenue Code." H. Rept. No. 2894, 76th Cong., 3d Sess. *Ken-Rad Tube & Lamp Corporation*, 10 T. C. 1217; *Frank J. Ambrose*, 18 T. C. 690. As was further said in *United States* v. *Milnor Corp.*, *supra:*

> In no instance was it ever suggested that a taxpayer should obtain tax advantage, or allowances for the amortization of property, to which it did not

bear that relationship which would entitle it to depreciation allowances, and the emphasis was always placed on the need to encourage the use of private capital by preventing the taxing of profits which contained a return of capital.

We find ourselves in complete accord with the opinion of the District Judge and his rationale, and on the basis thereof we sustain respondent as to this issue.

## Issue 5.

### FINDINGS OF FACT.

Petitioner's accumulated earnings and profits at December 31, 1935, were $5,267,715.49 and at November 30, 1938, were $5,541,679.11. The nontaxable liquidations of petitioner's wholly owned subsidiaries during 1930, 1931, and 1932, resulted in losses in the sum of $8,126,144.21. These losses are not reflected in the foregoing accumulated earnings and profits.

During the year 1935, petitioner distributed 277,785 shares of American Airlines, Inc. (hereinafter referred to as American), stock and 138,887½ shares of Canadian Colonial Airways, Inc. (hereinafter referred to as Colonial), stock as a dividend to its stockholders. Petitioner reduced the par value of its common stock outstanding from $5 to $3 per share and new certificates evidencing the new par value were issued. On April 16, 1935, a special and annual meeting of stockholders of petitioner was held, the minutes of which meeting follow:

The Chairman further reported that in his opinion as General Counsel of the corporation, the distribution of the stocks of American Airlines, Inc. and Canadian Colonial Airways, Inc. as hereinbefore mentioned would represent a partial liquidation of the corporation and partial return of its capital to the stockholders of the corporation, for convenience referred to as the payment of a partial liquidating "dividend"; that said distribution should be made not necessarily to the stockholders of record of the corporation as of a date fixed and determined by the Board of Directors, as in the case of an ordinary dividend, but to the stockholders of the corporation owning shares of stock of the corporation represented by certificates for stock of the par value of $5.00 per share, as evidenced by said certificates or other documents accompanying same, at the close of business on the date when the fund should be created out of which said distributions would be made, viz., at the close of business on the date when the capital of the corporation should become reduced and the required paid-in surplus thereby created, said date being the date upon which the Certificate of Reduction of Capital, previously authorized at the meeting, should be filed, in accordance with the General Corporation Law of Delaware.

After further explanation and discussion, upon motion duly made and seconded, the following resolutions were adopted by the unanimous vote of all present:

RESOLVED that the plans recommended by the Board of Directors of this corporation relating to the distribution by the Trustees under Declaration of Trust dated December 31, 1934 of the stocks of American Airlines, Inc. and Canadian Colonial Airways, Inc., and the eventual distribution of the stock

or proceeds from the sale of the stock of General Aviation Corporation and/or North American Aviation, Inc., as reported to this meeting, subject to such changes as may be deemed advisable by the Board of Directors or officers of this corporation, be and the same hereby are approved; and be it further

RESOLVED that said distribution of the stocks of American Airlines, Inc. and Canadian Colonial Airways, Inc. and the eventual distribution of the stock or proceeds from the sale of the stock of General Aviation Corporation and/or North American Aviation, Inc., be made to the stockholders of record as of such record date as shall hereafter be fixed by the Board of Directors of this corporation, or, in lieu thereof and as recommended to this meeting by General Counsel of the corporation, to the stockholders owning certificates representing the shares of capital stock of this corporation of the par value of $5.00 per share, as evidenced by the certificates or other documents accompanying same, upon the surrender thereof in exchange for certificates or other documents or items representing the stocks or payments to be distributed, and in exchange for certificates of capital stock of the corporation of the par value of $3.00 per share, or as may otherwise be determined by the Board of Directors of the corporation.

The cost basis of the above mentioned stock distributed in 1935 was $2,909,653.54. Petitioner distributed $513,883.75 in cash as a dividend to its stockholders during the year 1938, on July 22 to stockholders of record July 1.

Respondent reduced petitioner's invested capital in 1944 by $3,423,537.29 because of distributions made in prior years and allegedly not out of prior earnings and profits. Of such sum, $2,909,653.54 was the cost basis of the distribution of American and Colonial stock during 1935. The remainder, $513,883.75, was a cash dividend to shareholders in 1938. Petitioner (erroneously it now claims) reduced invested capital on its excess profits tax returns for 1945 and 1946 in the same manner.

OPINION.

The issue here posed is whether petitioner's distribution to its stockholders in 1935 of certain American and Colonial stock is to be treated, for invested capital purposes, as an ordinary dividend out of earnings and profits or as a partial liquidation. A subsidiary question is whether petitioner had sufficient earnings and profits to cover the stock distribution in 1935 and a cash distribution in 1938.

During the year 1935, petitioner distributed as a dividend to its stockholders 277,785 shares of American stock and 138,877½ shares of Colonial stock. At the same time, petitioner reduced the par value of its common stock outstanding from $5 to $3 per share and new certificates evidencing the new par value were issued upon surrender of the old. In 1938, petitioner distributed a cash dividend of $513,883.75. In his determination, respondent has reduced petitioner's invested capital for the fiscal year ended November 30, 1944, by the cost basis of stock distributed in 1935 and the amount of 1938 cash distribution.

With respect to the 1935 stock distribution, it is respondent's position that such distribution, as evidenced by the contemporaneous reduction in par value of petitioner's stock, represented a partial liquidation as defined in section 115 (i) of the Revenue Act of 1934.[5]

We have no doubt that petitioner, by virtue of the transaction in question, effectively reduced its capitalization under the laws of the State of Delaware. But a recapitalization is not necessarily a partial liquidation within the precise terms of the statute with which we are concerned. *John K. Beretta*, 1 T. C. 86. Nor is it of significance in this regard that such distribution would, in the opinion of the petitioner's general counsel and apparently its directors, represent a partial liquidation. Cf. *Tate* v. *Commissioner*, 97 F. 2d 658, affirming 35 B. T. A. 1236. The surrender and cancellation of $5 par value stock in exchange for the issuance of $3 par value stock was no complete cancellation or redemption of part of petitioner's stock within the meaning of the cited statute. *Minal E. Young*, 6 B. T. A. 472; *Pacific National Bank* v. *Eaton*, 141 U. S. 227, 234. The same number of shares were outstanding following the exchange as before. The only change that took place was a reduction in the par value of the shares. A mere reduction in par value is not a redemption or cancellation. *Mabel I. Wilcox*, 43 B. T. A. 931; *A. J. Long, Jr.*, 5 T. C. 327, affd. 155 F. 2d 847; see also G. C. M. 8175, IX-2 C. B. 134.

Respondent takes the further position that the losses sustained by petitioner in 1930, 1931, and 1932 on the nontaxable liquidations of its wholly owned subsidiaries resulted in a deficit in accumulated earnings and profits as of the dates of the distribution of stock and cash in 1935 and 1938 pursuant to section 761 (d) (1) of the 1939 Code,[6] and that, therefore, for invested capital purposes, such distributions reduced capital as determined. On the other hand, it is petitioner's contention that accumulated earnings and profits are not affected by nontaxable liquidations and that the reduction of invested capital

[5] Revenue Act of 1934.

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(i) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

[6] SEC. 761. INVESTED CAPITAL ADJUSTMENT AT THE TIME OF TAX-FREE INTERCORPORATE LIQUIDATIONS.

(d) ADJUSTMENT OF EQUITY INVESTED CAPITAL.—If property is received by the transferee in an intercorporate liquidation, in computing the equity invested capital of the transferee for any day following the completion of such intercorporate liquidation—

(1) with respect to any share of stock in the transferor having in the hands of the transferee, immediately prior to the receipt of any property in such intercorporate liquidation, a basis determined to be a cost basis, the earnings and profits or deficit in earnings and profits of the transferee shall be computed as if on the day following the completion of such intercorporate liquidation the transferee had realized a recognized gain equal to the amount of the plus adjustment in respect of such share, or had sustained a recognized loss equal to the amount of the minus adjustment in respect of such share;

under section 718 (b) (1) of the Code of 1939 [7] was error. Petitioner maintains that the distributions in controversy were, under the law applicable to the years in which they were effected, out of accumulated earnings and profits, and urges that section 761 (d) (1), *supra*, was not meant to and does not retroactively change the character thereof. Pointing to Regulations 112, section 35.718–2, petitioner contends that the concept of accumulated earnings and profits for the purpose of excess profits tax is generally the same as for income tax purposes. We agree with petitioner.

In determining earnings and profits for the purpose of the income tax, gains or losses, including those within the purview of section 112 or corresponding provisions of prior revenue acts, are brought into earnings and profits at the time and only insofar as such gains or losses are recognized in computing income under the law applicable to the year in which realized. *Commissioner* v. *Wheeler*, 324 U. S. 542. See also Regs. 86, art. 115–1, and Regs. 101, art. 115–3. Cf. *Butter-Nut Baking Co.*, 3 T. C. 423. The losses sustained by petitioner in 1930, 1931, and 1932 on the liquidations of its subsidiaries were not recognized under the laws applicable to such years. These losses were not properly includible in petitioner's earnings and profits at the time of the distributions in 1935 and 1938 here in controversy. Hence, such distributions were clearly out of earnings and profits when made and constituted taxable dividends. We think that section 761 (d) (1) did not retrocatively change the status thereof.

The general purpose of the statute in controversy is to adjust the invested capital of the transferee in an intercorporate liquidation so as to reflect the difference between the basis at which it held its stock in the transferor and the basis of the assets substituted therefor. See our Opinion in *California Casket Co.*, 19 T. C. 32, wherein is set out the legislative history thereof. See also Maloney, "Supplement C," 2 Tax Law Review 231, 243–246. With respect to any share having a cost basis in the hands of the transferee, section 761 (d) (1) provides that in determining the transferee's equity invested capital for any day following the completion of such liquidation, its earnings and profits are to be computed as if it had realized a recognized gain or loss equal to the amount of the plus or minus adjustment, the definition and provisions for the application of which are set forth in section 761 (b) and (c), respectively. In other words, any adjustment thus computed is to be treated as a recognized gain or loss for the purpose of determining earnings and profits to be used in the computation of

[7] SEC. 718. EQUITY INVESTED CAPITAL.

(b) REDUCTION IN EQUITY INVESTED CAPITAL.—The amount by which the equity invested capital for any day shall be reduced as provided in subsection (a) shall be the sum of the following amounts—

(1) DISTRIBUTIONS IN PREVIOUS YEARS.—Distributions made prior to such taxable year which were not out of accumulated earnings and profits;

invested capital. Such adjustment would not necessarily be the equivalent of the actual gain or loss realized, which gain or loss is measured by the difference between the basis of the stock and the fair market value of the assets received in exchange therefor. The statute is not designed to make taxable retrocatively transactions otherwise tax free nor to recognize actual gains or losses not otherwise recognized under the applicable law.

We are of the opinion that respondent's reduction of petitioner's invested capital by reason of the distributions in question is based upon a misinterpretation of the statute. Respondent is, therefore, reversed as to this issue.

*Issue 6.*

FINDINGS OF FACT.

An extra compensation plan was adopted by petitioner's board of directors and approved by its stockholders in 1942 effective December 1, 1941. The plan thus adopted provided, in part, as follows:

(b) *Eligibility.* At or immediately after the end of each fiscal year, the Board of Directors * * * is to decide and by resolution declare such persons or class or classes of persons among the officers and employees as shall be eligible to participate in the Extra Compensation Annuity Plan. The Board shall also determine the extent to which the President of the corporation is to benefit under the Plan. * * *

(c) *Creation of Extra Compensation Annuity Fund.* The Board of Directors * * * have [sic] directed by suitable resolutions that at the end of the current and each succeeding fiscal year of the corporation there shall be set aside for the purpose of creating the fund necessary to the operation of the Extra Compensation Annuity Plan an amount equal to 10% of the amount by which the consolidated manufacturing profit of the corporation and its consolidated subsidiaries exceed 6% of the consolidated manufacturing capital of the corporation and such subsidiaries for a particular fiscal year. This amount is to be computed without deduction of federal and excise [sic] profits taxes or the additional compensation provided for by the Plan. * * *

(d) *Allocation of Participation in Fund.* The President * * * shall determine which of the persons among the officers and employees (other than himself) who are eligible to participate as decided from year to year by the Board of Directors shall participate in the distribution and the amount to be allocated for the benefit of each such officer and employee. * * *

(e) *How Distributions Are to be Made.* The matter [sic] of making distributions to officers and employees whose eligibility to participate in the Extra Compensation Annuity fund has been determined as above outlined is reserved to the discretion of the Board of Directors * * * and * * * officers. * * *

(f) *Reservation of Powers by Board of Directors.* Nothing contained in the Plan shall be construed as in any way limiting the power * * * otherwise to increase the compensation being paid to any eligible officer or employee or to grant additional compensation or remuneration thereto in cash, by option, or otherwise, and whether or not any amounts are or would be distributable under the Plan.

Distribution under the plan was to be made not later than 3 months after the close of the fiscal year for which distribution was being made. The plan further provided for:

the right of the Board of Directors to suspend such Plan, for each fiscal year thereafter; provided, however, that the amount of additional compensation payable for each fiscal year beginning with the present fiscal year to end November 30, 1942 shall become an accrued liability of this corporation on the last day of each such fiscal year and shall not, with respect to any such fiscal year thereafter be subject to change, increase or decrease by the Board of Directors of the corporation; * * *

On May 27, 1942, petitioner's board of directors voted to suspend the plan for the duration of the national emergency. On November 25, 1947, petitioner's board of directors adopted the following resolution:

BE IT RESOLVED that for the present fiscal year of this corporation, which commenced December 1, 1946 and is to end November 30, 1947, all of the salaried employees of this corporation whose fixed salaries in each case for said year are not less than $6,000 shall be included in the class of persons among the officers and employees who are eligible to participate in the corporation's Extra Compensation Annuity Plan.

For the year 1947, the sum of $807,675 was determined to be payable under petitioner's Extra Compensation Plan. This amount was paid to petitioner's employees in January 1948.

Respondent disallowed the above sum as a deduction for accrued compensation payable in 1947 under petitioner's Extra Compensation Plan. He attributed it to 1948.

### OPINION.

There is here involved the deduction of the amount paid out by petitioner in January 1948 to its employees pursuant to its Extra Compensation Plan. The deductibility of such amount is not contested. Rather, the controversy is whether the deduction is properly to be taken in the fiscal year ended November 30, 1947, as contended by petitioner, or in the following year, as determined by respondent.

Some years prior to those here in controversy, petitioner adopted a plan, pursuant to which a fund was created at the end of each year to be paid out within a specified time to certain eligible officers and employees as extra compensation. The pertinent provisions of the plan are set out above in our Findings of Fact. In accordance with the authority retained by the board of directors, the board, in 1942, suspended operation of the plan for the duration of the then existing national emergency. However, by resolution of the board on November 25, 1947, the plan was reinstated as operative for the fiscal year ended November 30, 1947. Pursuant thereto petitioner paid out the amount of $807.675 to its employees in January 1948.

We have found that petitioner employed the accrual system of accounting. This being true, the question before us turns on the time when petitioner's obligation to make the payments in dispute became properly accruable. It has long been held that an item of expense is to be accrued in the year during which all the events have occurred fixing the amount thereof and the taxpayer's liability for the item though not paid. *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516; *Brown* v. *Helvering*, 291 U. S. 193. Applying the foregoing principle to the facts here present, respondent maintains that the amount of the obligation was determined after November 30, 1947; that the authorization by the board of directors, without which nothing could be paid, was after such date; that the board could have suspended the plan's operation at any time up to the time actual payment was made; and that such payment was not made until 1948. We do not agree with respondent's interpretation of the plan in controversy.

Petitioner's Extra Compensation Plan provided a fixed formula for determining the amount payable thereunder based upon petitioner's manufacturing profit for the year involved. That the determination of the exact sum to be distributed must necessarily await the closing of the books of account for the year and post-audit computation is of no consequence. The facts upon which such computation was dependent had occurred and been fixed prior to the end of the fiscal year 1947. Thus, although the amount of petitioner's obligation was unascertained thereat, it was not unascertainable. *Uncasville Mfg. Co.* v. *Commissioner*, *supra; Anderson-Clayton Securities Corporation*, 35 B. T. A. 795; *Roundup Coal Mining Co.*, 20 T. C. 388. The plan was made operative for the fiscal year ended November 30, 1947, by resolution of petitioner's board of directors on November 25, 1947. As we read the provisions of plan, the board was without power thereafter to suspend the operation thereof unless it rescinded such authorization prior to midnight, November 30. Nor is it material under established concepts of accrual accounting, if indeed it be a fact, that payment could not be compelled and was actually not made until the following year. *Heer-Andres Investment Co.*, 17 T. C. 786. Moreover, we do not deem it material that the specific identity of the obligees remained to be determined. *Foster Wheeler Corporation*, 20 T. C. 15. Thus, it is clear that petitioner's obligation under its Extra Compensation Plan was incurred, was properly accruable, and is deductible in the fiscal year ended November 30, 1947, and we so hold.

*Issue 7.*

FINDINGS OF FACT.

On December 13, 1946, petitioner entered into two contracts with Consolidated Vultee Aircraft Corporation (hereinafter referred to as

Convair) for the manufacture of ranges and home freezers at its Nashville, Tennessee, division for sale to Crosley. Under such contract, Convair was to purchase certain tooling in the performance thereof. The cost of the tooling was to be amortized at a definite rate over production, and if production was not enough, petitioner was liable for the unamortized cost of the tooling.

In the fall of 1947, petitioner realized that the models of ranges and freezers being manufactured for it by Convair were obsolete and in order to remain in business and be competitive, new lines of ranges and freezers would have to be designed and tooled. By November 30, 1947, Crosley had ascertained the number of the current line of ranges and freezers it would require Convair to produce during the fiscal year 1948, and on December 24, 1947, Convair billed petitioner for the unamortized tools which would not be absorbed in the 1948 production schedule in the amount of $558,894.43, which liability was paid on January 2, 1948. The line of freezers and ranges was discontinued in 1948 in accordance with the decision made in the fall of 1947.*

Petitioner owned 26.1 per cent of the outstanding stock of Convair at the time the two contracts were entered into between them covering the manufacture of ranges and freezers by the latter at its Nashville, Tennessee, plant. The original contract between Convair and Crosley was taken over by petitioner. Production continued on into 1948.

Respondent originally disallowed this item of $558,894.43 as expense in 1947, holding it to be a capital expenditure. This position was abandoned by respondent's counsel at the hearing. Respondent now agrees that the item is allowable as an expense but contends that it is accruable and allowable in the year 1948.

OPINION.

The final question in this case involves the accrual by petitioner of certain tooling expenses. The parties are now in agreement as to the allowability thereof. They differ only as to the year in which such expenses are properly accruable—whether it be the fiscal year ended November 30, 1947, or that ended November 30, 1948.

Petitioner was party to two contracts with Convair calling for the manufacture by the latter of ranges and home freezers for sale to Crosley. Pursuant to such contracts Convair purchased certain tooling, the cost of which was to be amortized at a definite rate over production. If production was insufficient fully to amortize the cost, then petitioner was liable to pay the unamortized cost of tooling. In the fall of 1947, Crosley determined that the models of such ranges and freezers had become obsolete and would be discontinued in the following year. Prior to November 30, 1947, it had ascertained just how

---

*NOTE: The immediately foregoing facts for the most part are not affirmatively shown on the record made herein, but appear as agreed to by the parties on brief.

many of the models it would require Convair to produce in 1948. On December 24, 1947, Convair billed petitioner for the unamortized tooling which would not be absorbed in the 1948 production schedule thus planned, which amount was paid by petitioner on January 2, 1948.

In his determination, respondent disallowed petitioner's claimed deduction of the foregoing payment for the fiscal year ended November 30, 1947, on the ground that the payment was a capital expenditure for tools used through 1948 when they became obsolete. At the trial, respondent conceded error with respect to the capital nature of the expenditure and is now taking the position that, although deductible, such expense was not accruable before the fiscal year ended November 30, 1948. Respondent recognizes that the significant factor upon which the payment was predicated was the number of ranges and freezers Convair would be called upon to produce in the final fiscal year 1948. The agreed facts show that the number of units petitioner would require Convair to produce in fiscal 1948 was determined prior to the close of petitioner's fiscal year 1947. Thus, during fiscal 1947, all facts occurred that fixed the fact of petitioner's liability to pay and from which the amount thereof could be readily ascertained, *Uncasville Mfg. Co.* v. *Commissioner, supra,* or reasonably approximated. *Burnet* v. *Niagara Falls Brewing Co.*, 282 U. S. 648; *Harrold* v. *Commissioner*, 192 F. 2d 1002; *Producers Fuel Co.*, 1 B. T. A. 202; and *Fraser Brick Co.*, 10 B. T. A. 1252. That Convair did not bill petitioner until after the close of such year or that the manufacturing was carried out in the subsequent year is not determinative of the time when the liability accrued. We, therefore, hold that the expense in question is properly deductible in the fiscal year ended November 30, 1947, as claimed by petitioner.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

TURNER, *J.*, dissents on the first point.

HARRON, *J.*, did not participate in the consideration of or decision in this report.

———

MURDOCK, *J.*, dissenting: I do not agree that the application of section 112 (b) (6) was avoided by what transpired with relation to the 200 shares of Crosley stock. Nor am I convinced that there was not a partial liquidation within the meaning of section 115 (i) of the Revenue Act of 1934 when, in 1935, the petitioner distributed 277,785 shares of American and 138,887½ shares of Colonial to its stockholders and, at the same time, reduced the par value of its stock by two-fifths.

OPPER, *J.*, agrees with this dissent.

———

PIERCE, *J.*, dissenting: On the first issue, which pertains to petitioner's acquisition of the net assets of the Crosley Corporation and the liquidation of such subsidiary, I am unable to agree with the majority opinion, for the following reasons:

1. I believe that the Findings of Fact made by the majority do not present a complete or adequate factual picture of the various steps and transactions here involved, for the reason that they incorporate the several exhibits by reference, without describing them sufficiently to reveal their importance and bearing on the issue.

2. I believe that the majority opinion, by focusing attention almost entirely upon a sale by petitioner to a third party for $5,225, of only 200 shares of Crosley stock out of petitioner's total holding of 496,030 shares of such stock, has diverted attention from the more important factors, including: (a) The nature of the particular transaction by which petitioner acquired the entire net assets and going business of Crosley, including gross assets carried on the latter's books at approximately 18 million dollars and liability of approximately 8 million dollars; (b) the delivery by petitioner to Crosley of the equivalent of 2,183,200 shares of its own stock, as the agreed consideration for the net assets and going business of such subsidiary; (c) the identity of the particular properties or securities, if any, which were distributed to petitioner upon the liquidation and winding-up of the Crosley Corporation; and (d) the continuing 90 per cent, or more, interest and control which petitioner had in the going business of Crosley, both before and after the elimination of the corporate structure under which such business had been operated. The 200-share sale of Crosley stock was, in my opinion, merely a diversionary maneuver which did not affect the reorganization of the business or the amount which any other stockholder of Crosley would receive in liquidation, and should not have been regarded as the determinative factor in deciding the present issue.

3. I believe that the application and construction of section 112 (b) (6) in the majority opinion are erroneous, in the light of all the evidence, including the exhibits; and that such application and construction are out of harmony, not only with the purpose and intent of the reorganization provisions of the Code, but also with the principle of *Gregory* v. *Helvering*, 293 U. S. 465, affirming (C. A. 2) 69 F. 2d 809.

4. I do not agree with the conclusion in the majority opinion that the evidence "clearly establishes such loss in the amount of $6,833,907.85." I agree with respondent that neither the loss nor the amount thereof has been proved.

It should be observed that the majority opinion does not pass upon the related issue raised in the amendment to the petition, wherein

petitioner contends that the transactions here involved produced, in addition to a recognizable loss of $6,833,907.85, a stepped-up basis for depreciation of the Crosley assets, in the amount of approximately 14 million dollars if the loss is allowed, or otherwise in the amount of approximately 21 million dollars.

## *I.*

The exhibits, together with the stipulation through which they were incorporated in the record, reveal the following:

*Exhibit 1–A* is an excerpt from the minutes of the special meeting of petitioner's board of directors, held on October 4, 1946, at which the procedures here involved were formulated. These minutes throw light on what petitioner's board of directors intended to accomplish through the transactions with Crosley, and what were the steps by which such objectives were to be attained.

The chairman of the meeting stated that the principal business for which the meeting had been convened was to consider "a proposal to consolidate the operations" of Crosley and two other subsidiaries of petitioner with the parent corporation, through (a) the acquisition of the assets and the assumption of the liabilities of said subsidiaries, and (b) the issuance of certain shares of petitioner's stock to the respective subsidiaries "to be distributed to the stockholders of the subsidiary corporations upon dissolution."

Explanations, reports, and recommendations relating to "the plan to integrate the subsidiaries with the parent company," were then received and considered. One of these reports, which was accepted and spread upon the minutes of the meeting, contained the following recommendation:

That we proceed with our plans for the acquisition of all of the assets of said corporations on a basis that will afford to the minority stockholders of said corporations as a result of the sale of their assets, or the dissolution and liquidation of said corporations, or pursuant to a plan for their reorganization, the distribution of The Aviation Corporation [petitioner's] stock in the following proportions for each minority share of stock of the subsidiaries outstanding:

In the case of The Crosley Corporation four shares for one.

[Other ratios were specified for the other subsidiaries.]

This same report also stated:

We shall endeavor to prepare detailed plans * * *, and in doing so shall keep foremost in mind that the officers and directors of all of these corporations which The Aviation Corporation [petitioner] controls have fiduciary responsibilities to the stockholders of the four corporations; that we are trying to eliminate the minority interests against their will and without their consent; that this can only be done legally as the law provides; that it is our duty and responsibility to see that the desired objectives are accomplished on the fairest possible basis to the minority interests of the subsidiaries and to all of the stockholders of all four corporations.

Resolutions were then adopted, which approved "the plan of integrating this corporation's subsidiaries" with the petitioner, in accordance with the recommendations made; and which authorized petitioner to acquire all of Crosley's net assets and business, and to issue a maximum of 2,183,200 shares of petitioner's common stock; said acquisition to be upon the terms and conditions set forth in a proposed agreement between petitioner and Crosley (which is hereinafter identified as Exhibit 4–D).

It was then further

RESOLVED that the Board of Directors of this corporation, after examination of reports of accountants and engineers and from other investigations, do hereby declare and find that the fair value to this corporation of the property, assets and business of The Crosley Corporation so to be acquired less the total of the liabilities and obligations to be assumed, in accordance with the aforesaid Agreement, is in excess of the par value of said 2,183,200 shares; provided, however, inasmuch as this corporation owns 496,030 shares of the issued and outstanding Common Stock of The Crosley Corporation and upon the liquidation of The Crosley Corporation, as provided in said Agreement, this corporation would receive from The Crosley Corporation in liquidation 1,984,120 shares of Common Stock of The Aviation Corporation [petitioner], this corporation waive its rights as a stockholder of The Crosley Corporation to receive such shares of Common Stock of The Aviation Corporation upon such liquidation of The Crosley Corporation and issue to The Crosley Corporation upon the acquisition of said property, assets and business not in excess of 199,080 shares of Common Stock of The Aviation Corporation;

*Exhibit 4–D* is the proposed agreement between the two corporations (called agreement and plan) which was subsequently approved and given effect. The salient features of the same are summarized in the notice sent to the Crosley stockholders (Exhibit 10–J), as follows:

SUMMARY OF MATERIAL FEATURES OF PROPOSED PLAN AND DISSOLUTION

1. Crosley will transfer and deliver to Avco all of its property, assets and business of every nature and kind, tangible and intangible, real and personal, including among other things its accounts receivable, cash, inventories, patents, trade marks and good will.

2. Avco will deliver to Crosley not more than 2,183,200 shares of the Common Stock of Avco of the par value of $3 per share and, in addition, will assume all of the liabilities and obligations of every nature and kind of Crosley including, but without limitation, tax liabilities. The number of shares to be delivered by Avco will be subject to reduction or adjustment to the extent that Avco may waive its rights as a shareholder of Crosley to receive such shares of Common Stock of Avco which, except for such waiver, would be distributable to Avco in redemption of the shares of stock of Crosley owned by Avco and to the extent that any dissenting shareholder of Crosley may demand payment of the value of his shares in the manner hereinafter provided.

3. Crosley will distribute to its shareholders the shares of Common Stock of Avco received by Crosley, and will be dissolved.

4. Upon such distribution the holder of each one share of the outstanding Common Stock without par value of Crosley will receive 4 shares of Common Stock of the par value of $3 per share of Avco.

5. Crosley will retain cash to pay shareholders who, within the required time, object in writing to the proposed transfer and demand payment of the value of their shares.

Upon the consummation of the transfer of assets, holders of certificates of stock of Crosley will be advised of the date on and after which, and of the place or places where they may surrender such certificates and receive a certificate or certificates for the shares of stock of Avco to which they shall be entitled as set forth above.

The above-mentioned 2,183,200 shares of petitioner's stock was exactly equal to 4 times the number of issued and outstanding shares of Crosley stock, which was 545,800 shares.

Paragraph Eighth of the agreement recognized that after Crosley had transferred its business to petitioner and received the shares of the latter's stock, its assets would thereafter consist of shares of petitioner's stock; and that these shares of petitioner's stock would be distributed in liquidation to its stockholders. This paragraph of the agreement also shows that the minimum amount of petitioner's stock to be delivered to Crosley was the number of shares which would permit distribution to the minority stockholders on a 4-to-1 exchange basis; and that, in the event any minority stockholder dissented from the plan, the number of shares to be transferred by petitioner and also the amount of cash assets to be received by petitioner would be reduced, so that the dissenters could be paid in cash.

*Exhibit 6-F* is a copy of the minutes of the special meeting of the Crosley stockholders on November 18, 1946, at which the agreement was approved. These minutes show that three separate propositions were there presented to the stockholders, and were approved on separate ballots. The first proposition called for approval or rejection of the proposed transfer of all net assets of Crosley to petitioner, and the issuance by petitioner to Crosley of not more than 2,183,200 shares of its own stock, upon the terms and conditions set forth in the agreement. The second proposition was that Crosley elect to wind up and dissolve in accordance with said agreement. And the third proposition was for approval or rejection of the agreement as a whole. On each proposition, 499,268 shares were voted; and of these 496,133 shares were voted in favor and 3,135 shares were voted in opposition. The number of these shares held by petitioner was 496,030.

*Exhibit 8-H* is the deed and bill of sale dated November 18, 1946, by which Crosley granted and conveyed to petitioner all its property and assets "of every kind and nature wheresoever situated," including among others, real estate, machinery, tools, inventories, books, records, accounts receivable, cash in bank, goodwill, going business, unfilled

orders, trade-marks and trade names; but excepting therefrom the shares of petitioner's stock "delivered to The Crosley Corporation as consideration for the foregoing property and assets"; and excepting also such amount of cash as might be sufficient to enable Crosley to pay its dissenting minority stockholders and to defray expenses incident to complying with the agreement.

The stipulation shows that petitioner transferred to Crosley, pursuant to the agreement, 173,688 shares of its common stock; and that it also waived, pursuant to the agreement, its right as a stockholder of Crosley to receive upon the latter's liquidation, such shares of its own stock as would, except for the waiver, have been distributable to it.

*Exhibit 7–G* is a broker's statement which shows that on November 18, 1946, petitioner sold to a third party in New York City, 200 shares of Crosley stock for the gross price of $5,225 cash. A pencil notation on the statement indicates that the sale was made at 1:22 p. m. It has been stipulated that this was after the adoption of the agreement by the Crosley stockholders at a meeting held in Cincinnati at 12 o'clock noon of the same day; and that it was before the transfer of Crosley's assets to petitioner and before the liquidation of Crosley. It also has been stipulated that the Crosley Corporation ceased doing business as of November 18, 1946, pursuant to notice of liquidation.

The record does not show whether this stock was transferred of record on the Crosley books, or whether the new holder received shares of petitioner's stock or cash on the liquidation of Crosley.

The stipulation shows that upon the liquidation of the Crosley Corporation, all the above-mentioned 173,688 shares of petitioner's stock which were transferred to Crosley were distributed to Crosley stockholders, other than petitioner. They were delivered to the consenting stockholders in exchange for 43,422 shares of Crosley stock. The stipulation also shows that the holders of 6,545 shares of Crosley stock dissented and received cash.

*Exhibit 9–I* is the certificate of dissolution of Crosley Corporation, which shows that it was filed in the office of the Secretary of State of Ohio on December 31, 1946. Other exhibits (Exhibits 15–O and 18–R) show that the business thereafter was operated as the Crosley Division of petitioner.

## II.

1. The factual picture presented by all the evidence is this: Prior to the transaction involved, petitioner had increased its shareholdings in the Crosley Corporation. On November 30, 1945, it had held 483,409 shares; and then before March 4, 1946, it had purchased an additional 12,621 shares, thereby enlarging its holdings to 496,030 shares, representing 90.88 per cent of all Crosley stock outstanding.

At the meeting of petitioner's board of directors held on October 4, 1946, plans were formulated "to consolidate the operations" of Crosley and two other subsidiaries with those of the parent, and to eliminate the separate corporate entities of the subsidiaries. Why petitioner did not proceed to effect this objective by buying up the remaining 9.12 per cent minority stock is not shown, and is not a matter for our concern. What petitioner did was to employ its voting control over Crosley to adopt a plan which would produce the same practical result, i. e.: First, to purchase or acquire, in a transaction between the two corporations, the entire net assets of Crosley in consideration for the delivery of shares of petitioner's own stock; and then to have Crosley liquidate and dissolve, with the result that the Crosley stockholders would receive upon the liquidation, no interest in the Crosley assets or going business but merely shares of petitioner's stock or a cash equivalent. The objective, as stated in the recommendation accepted at the meeting of petitioner's board of directors (Exhibit 1–A) was, "that we are trying to eliminate the minority interests against their will and without their consent; and that this can only be done legally as the law provides * * *."

2. In considering the income tax consequences of what was done, it is to be observed that under the agreement petitioner had an election to follow either one of two courses, which might have different tax results:

(a) It could acquire all the Crosley assets and going business by issuing and delivering to Crosley 2,183,200 shares of its own stock. If this course were chosen, petitioner would, as pointed out in the resolution of petitioner's board of directors (Exhibit 1–A), receive back from Crosley, as a distribution in liquidation to it as a stockholder, 90.88 per cent of the same shares (estimated in the resolution to be 1,984,120 shares) ; or

(b) Petitioner could, if it elected, acquire the Crosley assets and going business by issuing and delivering only that number of its own shares which would represent the difference between the above-mentioned 2,183,200 shares and the portion of the same which it would, as a stockholder of Crosley, receive back as a distribution upon the subsequent liquidation. But this course could be followed only on the condition that petitioner waive its right, as a stockholder of Crosley, to receive such of its own shares as it would be entitled, except for the waiver, to receive upon the liquidation.

Because petitioner did not have 2,183,200 shares available for delivery, it elected the latter course.

The effect of petitioner's election and waiver of rights was that the number of shares of its stock to be delivered to Crosley for the latter's net assets was reduced, and petitioner's right to receive shares

of its own stock from Crosley (which after the latter's transfer of its business were practically its only remaining assets) was extinguished. Thus, upon the subsequent liquidation of Crosley, petitioner was not entitled to receive, and in fact did not receive, any distribution from Crosley with respect to which the loss on liquidation here claimed could have been realized. Having used its Crosley investment in the acquisition of the assets, it could not use it again to establish a loss on the liquidation.

I would have held that the loss claimed on the liquidation of the Crosley Corporation is not allowable.

3. If, in the alternative, we accept the petitioner's contention that the Crosley assets were received as a distribution upon liquidation of the subsidiary (which appears to be the theory on which both parties have presented the case to this Court), then it becomes necessary to give effect to two important factors in the evidence which are the very antithesis of liquidation: (a) The issuance and delivery by petitioner to Crosley of the 173,688 shares of its own stock; and (b) the waiver of rights which petitioner gave in connection with the delivery of this stock. These shares, which were of reduced number by reason of the operation of the waiver, cannot be regarded reasonably as a capital contribution to Crosley. This is so, not only because the result would be to greatly increase the Crosley assets available for distribution to all stockholders, in violation of the intent of the agreement and plan; but also for the reason that under the provisions of the agreement this stock did not become a free asset of Crosley but was earmarked for use only in redeeming shares of minority stockholders on a 4-to-1 exchange basis. Thus, if we accept the premise that petitioner received the Crosley assets in liquidation rather than by purchase, it must follow logically that the 173,688 shares of stock were merely deposited with Crosley for use in redeeming the minority holdings, on a 4-to-1 exchange basis in accordance with the agreement; and that by reason of such redemptions, petitioner became substantially the only remaining stockholder, and was thereby enabled to take out the remaining assets in liquidation, without interference from any other stockholder.

Under this analysis, petitioner held a greater percentage of the stock of Crosley at the time of the liquidation than it had held at the time of the adoption of the agreement, notwithstanding its interim sale of 200 shares to a third party. It follows that, under section 112 (b) (6) of the Code, no gain or loss on the liquidation may be recognized; and that the determination of the Commissioner should be approved.

4. With further regard to petitioner's sale of the 200 shares of Crosley stock for $5,225, I would hold that this had no effect on the income tax consequences of the principal transactions here involved.

At the time these shares were sold, the agreement had been adopted, the last stockholders' meeting had been concluded, and Crosley had either ceased or was in the process of ceasing to carry on business. These shares had lost their vitality so far as pertains to the right to vote, the right to receive dividends, and the right to participate in a going business; and even as to liquidation, these shares had, by the adoption of the agreement, lost all right to acquire any interest in the going business, and could receive nothing except shares of petitioner's stock on a fixed 4-to-1 basis, or the cash equivalent. Thus, the new holder of these 200 shares which had been purchased for $5,225, became entitled to receive 800 shares of petitioner's stock which, valued at the stipulated figure of $6.50 per share, would equal $5,200; and the petitioner, by making the sale, merely increased by 800 shares the amount of stock to be delivered to Crosley under the agreement. The net result was equivalent to petitioner selling 800 shares of its own stock, which would have no effect upon the continuity of interest in the business or upon the amount which any other stockholder of Crosley would receive in the liquidation. In the event the new stockholder elected to take cash in lieu of stock, the result would be simply a reduction of approximately $5,200 in the amount of the Crosley assets which petitioner would otherwise acquire; and thus the sale of the stock would be tantamount to an assignment by petitioner of part of the cash which it was entitled to receive under the agreement, with the same absence of effect on the continuity of interest in the business and the rights of other stockholders.

Moreover, this 200-share sale, which had no business purpose and no effect on the principal transactions involved, should not be permitted to interfere with giving effect to the purpose and intent of the reorganization provisions of the Code, which include section 112 (b) (6). The intent of these sections, so far as they apply to the incorporation or dissolution of "controlled" subsidiaries, is to eliminate such corporate transactions from the class of events which give rise to recognizable gains or losses for income tax purposes. The last clause of section 112 (b) (6) (A), upon which petitioner relies, was intended, in my opinion, to operate like the second clause of the first sentence of section 112 (b) (5)—that is, to preserve the continuity of interest in the going business by preventing the parent corporation from dividing and splitting off portions of such business through sales of stock, which might entitle the new holders to take over parts of the business on the liquidation. I cannot believe that the Congress intended that section 112 (b) (6) should be rendered ineffectual by a transaction having the character of the present 200-share sale—where the petitioner, in the fractional part of a day between adoption of the agreement and receipt of the deed, transferred an unsubstantial portion of

its 90 per cent controlling interest, without in any way affecting either the continuity of interest in the business, or the rights or interests of any other stockholder of the subsidiary. As was said by the Supreme Court in *Gregory* v. *Helvering, supra:*

The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

As previously indicated, I would deny petitioner's claim to any loss on the liquidation of the Crosley Corporation.

Since the majority opinion does not deal with the basis question, I have not dealt with it in this dissenting opinion.